19CV 3115 DSD-BRT

RECEIVED
DEC 19 2024
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RECEIVED
DEC 18 2019
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Bruce A. Lundeen

Plaintiff,

vs.

City of Minneapolis

Defendant(s).

Minneapolis VA Health Center

Case No. ______________
(To be assigned by Clerk of District Court)

DEMAND FOR JURY TRIAL

YES ___ NO _X_

**COMPLAINT**

PARTIES

1. List your name, address and telephone number. Do the same for any additional plaintiffs.

a. Plaintiff

| | |
|---|---|
| Name | Bruce A. Lundeen |
| Street Address | 2628 Stevens Ave., |
| County, City | Hennepin, Minneapolis |
| State & Zip Code | Minnesota, 55408 |
| Telephone Number | 612 978 8973 |

SCANNED
DEC 18 2019
U.S. DISTRICT COURT MPLS

DEC 19 2024
U.S. DISTRICT COURT MPLS

2. List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption.

   a. Defendant No. 1

| | |
|---|---|
| Name | City of Minneapolis, City Attorney |
| Street Address | 350 S 5th Street, Ste. 210 |
| County, City | Hennepin, Minneapolis |
| State & Zip Code | Minnesota, 55415 |

   b. Defendant No. 2

| | |
|---|---|
| Name | Minneapolis VA Health Center |
| Street Address | 1 Veterans Drive |
| County, City | Hennepin, Minneapolis |
| State & Zip Code | Minnesota, 55417 |

JURISDICTION

3. What is the basis for federal court jurisdiction? *(check all that apply)*

   X Federal Question ☐ Diversity of Citizenship

4. If the basis for jurisdiction is Federal Question, which Federal Constitutional, statutory or treaty right is at issue? List all that apply.

   Denial of unenumerated due process rights

5. What is the basis for venue in the District of Minnesota?

   Plaintiffs and Defendants reside in Minnesota
   Facts alleged below occurred in Minnesota

6. STATEMENT OF THE CLAIM

6-1. Over the past 29 years that I have lived in Minneapolis there has been an ongoing extrajudicial persecutory campaign waged against me. A possible reason for this extrajudicial persecutory campaign is because of false allegations I had had improper intentions with young women in Seattle, WA. However, my being an outspoken citizen and frequent political candidate for State and local offices certainly may have contributed to the contemptible abuse of authority and misuse of resources intended for law enforcement and crime prevention.

6-2. Only when sniggering undercover law plainclothes youths who must have been employees of the Seattle Police Department arranged a meeting, did I ever meet up with any young women while in Seattle. The entertainment my stalkers have extracted both in Seattle and here in Minneapolis while harassing and humiliating me, and the access I have provided them to young women in the Minneapolis dance community, must have been enough to create significant interest in me. Indeed, shortly before her death my Mother said something about how I should not have gotten involved and taken modern and jazz dance classes.

6-3. The persecution has progressed from allegations about my mental health, to allegations about my propensity for violence, allegations about my sexuality, and finally allegations about my abuse of young women and girls. There has been a sort of psychological hazing, gas lighting and frequent not so subtle attacks on my income producing endeavors. Where they have not directly interfered with my employment and self-employment endeavors, I have been so rattled and distracted it has led to me estranging people myself.

6-4. During employment searches I have recognized that I have been classified into a category where special considerations are assigned. This led me to pursue self-employment.

6-5. Consistent strategies employed over years have been clear and phasic: Financially ruin, socially ostracize, and libel slanderously. Amenable VA care givers advanced the objectives by first attempting to create a disability, and then very, very possibly creating a situation where I could have been murdered during a medical emergency within the VA Medical Center.

6-6. The resources engaged in the persecutory program very likely exceed those that the Minneapolis Police Department could muster. The individual who created the situation ultimately leading to my being rail-road out of employment in the Federal Court House had access to controlled spaces in the building. Since then I have been told there was an immediate turnover of staff in the 7th floor Secret Service offices after I protested to GSA. To me, this implies abuse of my civil rights by a Federal law enforcement agency. As I have composed and edited this complaint and other documents changes in the way

my online computer operates indicates computer surveillance.

6-7. In 1992 while going to the Minneapolis VA Hospital for help with depression a psychologist culpably contributed to and enabled this extrajudicial persecutory campaign by writing a document called a "Supplement Defined Database". This document describes my personality in extremely unfavorable and threatening terms. No past or present friend or acquaintance would recognize this profile as describing me.

6-8. In 1991 I went the Minneapolis VA Hospital for help with depression. An anti-psychotic medication called Haldol was prescribed. Haldol is known to have permanent disabling side-effects. Fortunately, my Mother, a Licensed Practical Nurse, recognized the drug and took it away from me saying, "You're not taking that!". Twenty-five years later in 2017 I went to the VA Hospital for a removal of a cyst on the back of my neck. While blood was being taken for pre-surgical "blood work", I observed the technician, whom I had waited to the end of phlebotomy clinic hours for, and who was distinctly different from the other technicians, briefly insert a syringe into my arm. He did not empty the contents of the syringe before drawing blood into the blood sample vials, but the next day following the blood taking I became very, very ill and was sick for two weeks.

6-9. I have many things to be grateful for, but not taking the Haldol pills and not going to the VA in the days following the blood sampling will forever remain most revered.

6-10. I have been and may continue to be a conservative candidate for political office. Assumptions about my position on social issues which are very likely wrong, may have contributed to this vicious stalking behavior. I remain a fervid supporter of patrol division Police, but not so much for the undercover, plainclothes units whose actions are not so carefully scrutinized.

6-11. A complaint has been filed to the Minneapolis Office of Police Conduct Review but it seems to be languishing. As the complaint sits in the Office of Minneapolis Police Conduct Review activities that appear to be intimidation and retaliatory continue. During the past 25 years I have frequently asked for help with stopping law enforcement extrajudicial persecution. Since it is unlikely we will identify the perpetrators of this charade, I am finally clearly stating that it could be occurring. If this complaint progresses to a discovery stage I think people will confirm that something is amiss.

7. REQUEST FOR RELIEF

7-1. I want the Court to issue an injunction prohibiting further meddling in my affairs by law enforcement agencies to include but not be limited to the Minneapolis Police, the FBI, the Secret Service, or the Federal Reserve Police.

7-2. The VA should be forced to issue a statement in how Haldol can be prescribed for depression and create a policy managing fraternization of law enforcement professionals and medical personnel.

7-3. Initiate an examination of the resources allowed law enforcement by the Patriot Act. When expropriated for retaliation, personal vendetta, or wrongful persecution, these crucially important tools for legitimate law enforcement and crime prevention are put in jeopardy. Abuse of them creates a dreadful threat for the individual. Particular attention should be directed at corrupt use of cell phone manipulations, 'cyber' computer measures, and 'sneak and peak' warrants or home invasions done with or without a warrant.

Date: 12/18/2019

Signature of Plaintiff Bruce A. Lundeen

Mailing Address 2628 Stevens Ave
Minneapolis MN
55408

Telephone Number 612 978 8973

Item 5, Assets

Motor Vehicle #3

$700.00

1984 Jeep CJ7

Motor Vehicle #4

$200.00

1980 P30 Van

Vehicle # 5

$1200

1996 Suzuki S40 Motorcyle

Vehicle #6

$1400

1986 Honda Goldwing Motorcycle

Item 6 - money owed to me

| | |
|---|---|
| Toni's Market | $395.00 |
| Grace Temple | $1575.24 |
| Bay Leaf Indian Cuisine (see 2nd page) | $836.83 |

Recievables Total $3883.05

These are normal business ~~debts~~ recievables, some of which may be uncollectable

RECEIVED
FEB 13 2020
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

Bruce A. Lundeen

Case No. 0:19-cv-03115-DSD-BRT

Plaintiff,

**MOTION TO AMEND A DOCUMENT ON PACER:**

"Missing pages in "38 Pages of 210 Items" and "Missing attachments 1, 2, 3, and 4"

vs.

City of Minneapolis

Defendant(s).

Minneapolis VA Health Center

1. While reviewing the online PACER documents I noticed that two pages were missing from the document called "38 Pages of 210 Items".

SCANNED
FEB 13 2020
U.S. DISTRICT COURT MPLS

2. Although all copies of the document I had saved were also missing pages 21 of 38 and 23 of 38, I did find those pages in an earlier draft of "38 Pages of 210 Items" when it was 33 pages long. At the moment the document was saved it was a work in progress.

3. Those pages numbered 21 of 33 and 23 of 33 are included in the Amended "38 Pages of 210 Items".

4. Neither were the attachments referenced in "38 Pages of 210 Items" included in the online PACER documents. These attachments were referenced as attachments within the writing of " 38 Pages of 210 Items"

5. Accordingly, the attachments referenced in "38 Pages of 210 Items" are attached as they should be at the end of the document. They are not numbered as part of the document; the document page numbering stays the same.

6. I do not know how this happened. I was shocked to discover these articles missing from the "Filed" copy published in the PACER system. I can only accept the responsibility for not ensuring these articles were not accompanying the ANSWER TO ORDER dtd January 7, 2020 referenced in Paragraph 21. No attempt to obscure or change <u>any</u> part of the document has occurred.

Date: 2/13/20

Signature of Plaintiff Bruce A. Lundeen
Mailing Address 2628 Stevens Ave
Minneapolis, MN
55408

Email Address bruceclundeen@msn.com

Telephone Number 612 978 8973

19cv3115 DSD/BRT

## AMENDED "38 Pages of 210 Items"

1. I have struggled about the commitment of filing a pro se complaint in the Minneapolis Federal District Court for many years. My objective is not so much to recover for the losses I have suffered from Minneapolis Police, and perhaps the FBI and the U.S. Marshal Service, of which there have been many, but to reveal the incredible abuse of authority.

2. I suspect that the question never is asked: Have uniformed Police Officer been murdered because a plain-clothes, undercover Police unit have harassed and intimidated a person, driving him to such desperation that it seemed to him, the victim, there no other solution than retaliate with violence.

3. I believe Minneapolis Police have intentionally arranged employment dismissals specifically having the intention of precipitating a violent response from me.

4. For me the lack of oversight has reduced my ability to provide for myself, enjoy natural interpersonal relationships, corruption of my quest for help with depression and a minor surgical procedure, and deprivation not a small amount of happiness and peace of mind. This seems to me to be a viscous, cowardly assualt on my constitutional due process rights by law enforcement agencies.

5. I can only explain my interpretation of my experiences as a wrongful imposition of "street justice" – extrajudicial punishment – by plain-cloths, undercover Minneapolis Police Officers who are members of so-called "Community Action Teams". The revolting thought of Police Officers assuming the role a judicial tribunal is made more repugnant by my assertion that the underlying assumptions made by Seattle Police equivalents to our "Community Action Teams" are and were false.

6. A 1992 confrontation with a then-young Minneapolis Police Officer drew the attention of Minneapolis Police Officers to me. As I recall, the Officer I had the confrontation with was subsequently dispatched to the western States where I had lived. Upon his return it must be the Officers in Seattle shared with him embellished reports.

BT
SCANNED
FEB 13 2020
U.S. DISTRICT COURT MPLS

Preferring not to enroll in a formal Institution, I created a futile program of self-study in technical matters related to my employment. Over several years I became a frequent visitor to coffee shops and what was then called Kinko's and now FedExOffice in the University of Washington District of Seattle.

8. I became familiar with but never intimately friendly with college students and other youth. I believe young undercover, plain-clothes Seattle Police recruits seized on the opportunity to get facetime with the young woman who were Kinko's employees. The only time I was in the proximity of any of those girls outside of the Kinko's facility was in arranged. I recall with bitterness greeting a pretty, young college freshman named Heidi during a surprise encounter in a Montlake Park neighborhood coffee shop. She walked me over to a sidewall bench were three grinning clowns – these must have been relatively newly hired undercover, plain-clothes Police Officers – sat. She introduced them as her "friends". Those were not her friends.

9. Returning to the city of my birth assuming I would have the support of my family, the confrontation documented in Attachment #1 seems to have instigated intense scrutiny of me. I became inured of the continual harassment – stalking really. As these people persistently poked, goaded, and interfered in my life I "moved on" numerous times, ignoring their criminal behavior. I think there are people who might volunteer evidence of the subtle stalking if asked. Comments made over the years certainly indicate meddling, and this is related to the more intrusive infringements on my standing in the community. They have created major impediments in my life intended to deny me financial success, happiness, and normal heterosexual relationships.

10. Cowardly, criminal behaviors are management prerogatives, and are encouraged by supervisors. New hire misguided youth trying to make an impression of their daring and resourcefulness have been stalking me. While I suspect some of the lawless behavior was carried out on personal time, the misuse of law enforcement resources meant for crime prevention and law enforcement constitutes felony-level intent.

11. These are people who have entered my house and removed documents to prevent exposure, and at least attempted to damage my property interfere with my ability to enjoy life. They have sabotaged work I have done and derail good things I wish I could do. They persuaded a Veteran's Hospital therapist to construct a medical diagnosis that might create the opportunity for forceful intervention. See page 2 of the Attachment #2, paragraph 3. When it became apparent that slander, sabotage, suborning third party individuals to confound my life would not disrupt my life or facilitate a criminal act on my part they incited a dreg employed by the VA Hospital to inject a compound that might have killed me as blood was taken during preparation for minor, walk-in surgical procedure.

12. Frequent use of slander under the guise of official law enforcement activities has put these actors in the position of compromising their integrity before the public. Except when I myself weakened, I tried to avoid announcing to members of the public the insidious activities of our Minneapolis Police undercover, plain-clothes Community Action Team members. For the most part I have described the malicious, venomous attacks only to elected officials and

13. The respect for the mission I accorded these actors in the Minneapolis law enforcement community is futile.

14. Claudia Nicolae's picture was posted to my facebook page when a Republican group met at Bill's gun range. I cannot imagine what they were trying to prove or express.

15. Charlie Weaver and Lisa Goodman were written letters describing how traffic semaphores were stalled as I waited. There have been witnesses on two occasions.

16. Inspectors – Liz Reil, from Buildings, now Stacy Perera from Plumbing Inspector have problems with me.

17. Tenants have been stirred up, and three for certain; Mackenzie Kath, France Barbou, and France's roommate Elizabeth Grans*****ski were clearly "plants". France and Elizabeth, or their guests, sabotaged house fixtures as did friends of Harper, a unscreened tenant Keyher moved in.

18. Damage to my property has been done. My truck when left on the street had a tire flattened and a taillight broken. Lt. Rinehart knows the details, he met me at O'Rielly's Auto Parts when I was buying cans of flat-fix.

19. As far as I can tell, no one documented my visits to CRA several years ago. Lee Ried the former CRA Executive Director has said I should file for a release of data that may be still in the records. I called Mr. Ried August 13th. If the records have been purged he will speak in my behalf.

20. I was told Secret Service agents were transferred after I was railroaded out of employment at the Minneapolis Federal Court House. I was viciously fired from employment with CMC & Maintenance, a GSA contractor.

21. First and second complaints to the VA Inspector General have been closed as far as I know without review. One of those complaints was about what appeared to be an attempt to murder me.

22. A small group of Minneapolis Police Officers – who must be Members of plain-clothes, undercover, so-called Co0mmunity Action Teams - must have misused resources intended for law enforcement and crime prevention. They have targeted me for retaliation. In their quest for retribution they have dragged individuals who would have otherwise been disinterested third parties, and sometimes these third parties have suffered loss. If not loss, they have deceived citizens. An favorable outcome to revealing Minneapolis Police retaliatory activities might be revealing how independently operating Officers lacking supervision and oversight can invest their time influencing others to accomplish deceitful objectives.

23. There has been seldom indication of uniformed patrol Officer knowledge of the conflict other than with Lieutenant Rinehart, who shares the same name as a Veteran's Affairs psychologist who I was seeing for depression at the time of the conflict with now-Lieutenant Zimmerman, head of the Homicide Unit. Lieutenant Rinehart has by his expression indicated concern.

24. The mental stress is severe, and my sense of security has been grievously undermined and diminished over time. I think I can convince how the Minneapolis Police interfered in my life in many varied ways, to include even with an attempt to disable or kill me. The experiences at the Minneapolis VA Hospital I have sustained must not be disregarded.

25. There appears to have been an attempt to murder me, and another incident to disable by the prescription of a anti-psychotic medication known under the trade name Haldol. Other experiences with the VA indicate an awareness of my seeking care at the Minneapolis VA Hospital. I shall explain these incidents later, but since my terminating medical care with the VA and subscribing to a commercial supplementary Medicare policy with Medica.

26. Furthermore, documentation I was encouraged to submit to the Veteran's Affairs Office in the Whipple administrative building was deliberately and fraudulently modified after my signature was affixed. The fact that the responses to my local inquiries were evasive but that the processing offices who took control of the application for benefits after submission were direct indicates conspiracy.

27. I am compelled to tell my story, and in my way of thinking, the only way that it will be heard is to file a complaint in the Minneapolis Federal Court House. Maybe in describing what I consider a massive abuse of authority future unemployment decisions will take, when appropriate, look at the situation from a different perspective.

28. Strange observations, peculiar incidents, and suspicious events immediately began to occur after I had a confrontation with Officer Richard Zimmerman in 1991 who was at that time a Minneapolis Police Officer assigned to a Community Response Team (See attachment 1). I wrote this letter to then-Councilmember Sharon Sayles-Belton.

29. While I was genuinely concerned that false statements were leading then Patrolman Zimmerman and other Minneapolis Police Officers to wrongly investigate and sometimes raid the homes of young Vietnamese men, Officer Zimmerman took my phone messages and a written message left at

the 5th Police Precinct desk as an attack on his credibility and integrity. I understand his reaction, but the then young Officer Zimmerman telling me, "I will own your house" (when I didn't own a house) was a little unprecedented and extraordinary. Generally, I do not believe that Officer Zimmerman, who is now a Lieutenant and in charge of the Homicide Division, has been actively or continually involved in this vicious charade. There have been, I believe, egregious abuse of discretion in administration of law enforcement authority.

30. Before leaving employment with the City of Minneapolis as Chief of Police, Bill McManus brought then Sergeant Zimmerman and I together for a few moments at a social function at The Woman's Club of Minneapolis. My impression was that Officer Zimmerman is a man of good character and would not harbor a grudge. Unfortunately, over the years and in my desperation, I have said and implied things about Minneapolis Police retaliatory activities that would naturally in include Officer Zimmerman as a participant, a fact that I have no firm evidence to be true.

31. The fact is that the Hennepin County Attorney's Office already had demonstrated some interest in me. A now retired investigator named Mike Atkinson had investigated claims about me. I had been told to contact Mr. Atkinson in a letter. As we talked on the telephone, he said with some exasperation in his voice and sort of under his breath to me on the telephone, "I am not going to jail an innocent man".

32. I note that I believe Mr. Atkinson was formerly a Police Officer and went to law school while working for the City. I understand he is now retired, still healthy, and around town doing unrelated, part time work.

33. In 2014 I filed and Ethics Complaint with the City of Minneapolis. In response to my appeals for assistance with the City of Minneapolis on July 15, 2014 the Minneapolis Ethics Officer advised me they would no longer act on any of my concerns.

34. Contemplating on the past twenty-eight years I have the following musings: I was incredulous and outraged immediately following and for some time after the incident where Officer Zimmerman told me, "I will own your house". The obvious Police scrutiny was oppressive. I actively criticized the Minneapolis Police for retaliation verbally and in writing. Admittedly, sometimes my verbiage could have taken as offensive by Police Officers, but I have been ignored and marginalized.

35. Within a day or maybe days of the confrontation between Officer Zimmerman and I, I was fired from my job at Purina Mills then located on 38th Street and Hiawatha Avenue as a shift Production and Maintenance Engineer. While as the years pass, I admit that my behavior may have justified some corrective action. Dismissal was a rather extraordinary measure as have been two subsequent dismissals of which I will describe later in this complaint. Informal or formal counseling might have served the purpose of correcting my conduct – if it was in fact problematic. I have come to believe termination was premature, but the process taken during the dismissal was appalling. The Plant Manager assembled the entire shift and others who were still on-site, except for the other Maintenance Engineer with who I worked closely with, to witness his terminating me. It was a intentionally constructed humiliating and vicious scene. I don't know where John was at the time, and we remained friends for many years after my termination from employment with Purina Mills.

36. My decision to file this complaint in the Minneapolis Federal Court is much motivated by the possibility that the abusive dismissals were encouraged and intending to provoke a response by me that would reflect unfavorably on me. Fact is, it was only with Purina Mills that I did anything other than start over, and then I tried to challenge the dismissal administratively and legally.

37. After being dismissed from Purina Mills but before finding other employment, as I recall, I collected about $1800.00 of unemployment benefits. Probably at the discretion of the Plant Manager, Purina Mills refused to approve disbursal of the benefit, in this case two or three weeks of benefit. Believing the termination was wrongful I challenged the decision. State Unemployment Hearing Officers

sustained the decision of the company, but at some time during the process the Plant Manager was transferred to a smaller Purina Mills facility in the Southeast United States. It was hard to consider the transfer, that occurred during the school year, a promotion. Purina Mills counsel wrote me a check for the benefit I had collected when we met prior to appearing before a Federal Judge in the St. Paul Court House.

38. At the same time, perhaps aware that I was going to the Minneapolis VA Hospital for help with depression, the Minneapolis misled care givers to embellish medical documents with diagnosis that overly stated any penchant for anger and violence. Minneapolis VA Hospital stepped out of their role caregivers and must have been convinced to prescribe Haldol, a dangerous, ancient, antipsychotic, for a condition that I did not have. I believe they exploited my going to the VA for help with depression and wrongly influenced my mental health care providers.

39. The mental stress is severe, and my sense of security has been grievously undermined and diminished over time. I think I can convince how the Minneapolis Police interfered in my life in many varied ways, to include even with an attempt to disable or kill me. The experiences at the Minneapolis VA Hospital I have endured must not be disregarded.

40. For twenty-seven years I stayed away from the Minneapolis VA Hospital. Thinking it best in financial terms to have the VA Hospital perform a minor walk-in surgical procedure it was obvious from the initial visit that a subterfuge in VA medical records existed. As I have done so often, I foolishly convinced myself to ignore the obvious indications of Minneapolis Police corruption of my VA medical records. During pre-surgical bloodwork I noticed use of a syringe in addition to the blood sampling vials and the following days became extremely feverish and weak.

41. Phone records will confirm that I called the VA. I spoke to a nurse who said to examine the site where the blood was being taken. Understandably, her thoughts were to infection and I am sure never connected the scenario I was trying to describe.

42. In 2016 I took applied for and was hired by CMC & Maintenance, a GSA contractor providing building operations services for the Minneapolis Federal Court House. Knowing a mission of the U.S. Marshal Service was to protect Federal Judges, I knew that that there would be a background investigation, and that such an investigation would reveal any prosecution-justified activities I had engaged in in the past. I, in part, took applying for the job as a test. I gave law enforcement a method by which would reveal any legitimate persecutorial misconduct on my part. I was hired which must mean that I have no prosecutable – fabricated or actual – records. It follows that since there are no prosecutable records the stalking, I claim is just that: Stalking, and the stalking motives are based on retaliation.

43. As I gained experience as a CMC & Maintenance Building Engineer – a job not at all dissimilar from what I have done much of my working life – I was given increasing responsibilities. However, equipment and machinery I had worked on, sometimes suspiciously to me at least, failed. Specifically, three instances I recollect were the Make-up Air that provides initial summer cooling of fresh outdoor air to the top six floors of the Federal Court House, a VAV (Variable Air Volume) box outside of Judge Montgomery's chambers, and the air conditioning for the District Court Data Center closet in the hall outside the Chief Judge's chambers.

44. At the same time an air conditioning device called a VAV box inside Judge Montgomery's chambers directly above her conference table failed. I had been doing preventative maintenance on HVAC equipment on that floor

45. Another distressing incident occurred with the District Energy Condensate Return Pump. In the Steam Pressure Reducing room in the basement there is a dual pumping station. This machine has two pumps, one a back-up should the active pump fail. The "station" was acting up and only occasionally would overflow when a pump would not activate. Of course, Minneapolis Energy adds chemicals to the steam it provides and wants every possible ounce of condensate back.

46. My troubleshooting techniques always involve using the diagrams and manuals provided with a piece of machinery. I was trained and graduated from a School of Engineering, and while I have learned to generally avoid re-engineering machinery, I inquisitively want to examine and study the original documentation. This documentation can be very helpful diagnosing equipment failures when on-site personnel must repair machinery but is seldom taken advantage of by Building Engineers. For better or for worse, Building Operations managers prefer to call in contractors to do in-depth trouble shooting and more complicated repairs.

47. Anyway, I was assigned to repair this Dual Pumping system. I asked for the documentation. Although there was no manual, there was an electrical diagram, and it was a typical lead-lag circuit. What the electrical diagram does for you is give you electrical terminal and connection information that makes troubleshooting for the faulty component easier. Anyway, the diagram was missing on the second day when I came to troubleshoot for the problem. Jeff Broman, my on-site supervisor, didn't know what had happened to it, and in fact seemed oblivious that it had ever existed.

48. Fearing intentional sabotage of work I had done, and that that would be detrimental to my employment, I called the CMC and Maintenance Employee Hotline. I spoke to someone who identified herself as Patty McCue, President/Owner of CMC & Maintenance. I explained what was happening, or my suspicions and concerns of what was happening.

49. I was not long after and I started working at the Minneapolis Federal Court House I noticed the "grinning jimmy". The first time was in the elevator. Three of us were in the elevator, the third person must have been one of the two people who got off the elevator behind the "grinning jimmy" chirping, "jimmy, jimmy". The 'grinning jimmy' said to his minion, 'it is time for another trip'. The minion was confused but 'the grinning jimmy' only grinned. They got off on the sixth floor, the U.S. Attorney, and I think had gotten on the 7th, Secret Service.

50. There was one or two other times, but the best was when I was working on the 7th floor drinking fountain adjusting the floor rate. The 'grinning jimmy' got off the elevator and walked by, I looked at his back after he passed by on his way to the other end of the lobby. He turned his head sideways I noticed a little smirk, just then another elevator door opened, and two younger fellows got off the elevator, one of them chirping "jimmy, jimmy".

51. It was at that moment I felt I knew who my stalkers were. At that moment the job with CMC & Maintenance was no longer important.

52. As my status as a Building Engineer in the Minneapolis Federal Court House declined and I realized that termination was imminent I spoke regularly about my concerns with Mr. Broman, and, as I mentioned previously, called the Employee Hotline. Despite my pleas, I was issued first one and then a second warning. Knowing the end was near, I obliged CMC & Maintenance Chief Operating Officer Jason Gatchell by signing the warnings and stepped up my self-employment preparations.

53. Finally, some final event led to termination, and it was conducted in a vicious, unwarranted fashion. U.S. Deputy Marshalls, some of whom I had been friendly with, were assembled outside the basement Building Operations Office when I was ushered in to be fired. In the office the Local 70 International Union of Operating Engineers Business Manager Dave Monsour, the now-retired shop steward, a senior Deputy Marshall, and Jeff Broman were assembled and Jason Gatchell was reached on the phone. In an insane diatribe, CEO Gatchell insulted, my performance, my attitude, and my being. In retrospect, I should have reached behind me and put my finger on the phone cradle switch, signed the dismissal papers, and been escorted out of the building. Instead I endured the vicious verbal abuse. If Jason Gatchell's triad indicates the attitude CMC & Maintenance has toward employees, in my judgement CMC & Maintenance is unfit to enjoy the privilege of lucrative GSA contracts.

54. After Gatchell was finished and I had signed the dismissal papers we all left the office. The U.S.M.S. Deputies were waiting outside the office and all carrying radios. They watched me change

cloths and put my belongings in a box. I walked out of the Minneapolis Federal Court House building loading dock and started over again as a self-employed HVAC technician.

55. I left with a CMC & Maintenance company cellphone which has since been removed and from the box in my top dresser drawer. The empty box is still there. Other items and documentation are missing from my house as well. I think they were removed by CRT members during home invasions.

56. One specific item that has been taken was my military Reservist ID card. I have a place for cards – inside a home safe that I don't lock. It was removed.

57. In my judgement this dismissal as well as that at Purina Mills and two or three other involuntary separations from employment were instigated and orchestrated to inflict as distress and personal indignation. Perhaps not gleefully, but in some ways a show of superiority, employers in my judgement have been unfair to me. Others too, experience the same indignities despite the guidelines meant to insure a respectable termination. In my case, however, I believe terminations were designed to inflict pain and precipitate alienation and asocial behavior.

58. Following my dismissal from CMC & Maintenance I more or less have been successful maintaining my financial position, but my esteem and self-confidence has been horribly diminished. The fact that government employees can covertly infiltrate social circles, sabotage the employer-employee compact, and invade a private domicile.

59. While the experience at Purina Mills was distressing, the experience with the Hines Company and later with CMC & Maintenance were, in the same way, humorous. Even with the obvious and certain inconvenience sudden job loss entails, most of us fellows in the trade share dismissal experiences. The humor in my portrayals bring smiles. Usually us guys are not unemployed long, which sort of speaks to a dichotomy about the alleged lack of experience, training and available job candidates, and employer needs.

60. However, there are some very, very bad stories too, that are indicative of the abuses of power employers take over employees. Sometimes so evil that the insult to dignity, sanctity, and inviolability are so horrific that it almost makes a violent reaction justifiable. No one should be treated the way I have been treated. Fortunately, I have never taken the scorn of employer abuses seriously, nor fortunately have my experiences been to serious an affront to me, but I have seen it happen.

61. Mail has been missing. At the same time two Post Office Supervisors in the 31st Street and 1st Avenue Post Office Branch seemed to indicate Minneapolis Police have meddled with my mail. A letter has been provided Internal Affairs.

62. My Minnesota DMV vehicle registration for August 2019 were not received in July, but one was found in my mailbox on August 13th.

63. My monthly Medica Medicare Supplementary Health Insurance invoices have not been received, although I have been told they were mailed. This is very important to me because without I would be referred to the VA where I would be murdered.

64. More recently a very important customer for me has a tenant in a building they own. I generally take care of the heating and cooling needs for this customer, but also do other things. This tenant apparently does, among other things, background investigations. The information available on the internet has diminished since I first searched information on them. Another tenant in the same building, a small low-rise office building, has made a comment that the owner of the business services company has made a comment about something that would be contained in a background investigation. I would like to inquire about what a background investigation of me might reveal. Could it be that a background investigation would reveal negative comments about me that are patently false?

65. This complaint contains a portion of the experiences I have written in another document. There is much more to tell but it may be best to seal the records until the Court reviews them.

66. If a law exists that has enabled the Minneapolis Police to carry out a campaign intended to hinder my life by rumoring, the law must be struck down.

67. If a court order exists that has enabled the Minneapolis Police to carry out a campaign intended to hinder my life by rumoring, the decision must be reversed.

68. Machinery I had been working on was sabotaged in the weeks just before I was involuntarily terminated from employment at the Minneapolis Federal Court House. I was an employee for CMC & Maintenance, a GSA contractor providing building operations services in the Minneapolis Federal Court House.

69. Since I believe this without a doubt was happening at the Federal Court House, I must be careful to not designate every disappointment to sabotage. This would be easy for me to do so, and I try to guard against doing so. However, it has not been unusual to experience odd suspicious events since termination with CMC & Maintenance.

70. On several occasions it has seemed that while operating my company Bruce Arnold Mechanical vendors seemed to have been corrupted supplying materials that were unusable. Specifically, in one event, the dimensions of a custom piece of tempered glass was changed. The window glass was unusable as it was cut and then tempered to the wrong size by Brin Glass. In my judgement, the behaviors of the people in the Brin Glass Fabrication Will-Call desk was weird. I think the dimensions were changed after I placed the order with the sales person. When ordering a piece of tempered glass on make sure of the dimensions before placing the order.

71. On August 13 I purchased materials from Goodin Plumbing supply. The willcall desk supervisor was interested in what I was buying. This is strange, and the same thing has happened at Metro Ace Hardware with Chad, the store manager. I think if a legitimate inquiry were made the investigator would be told someone wanted to know what I was doing.

72. There may be Police "stool pigeons" harassing me for money or in exchange for drugs. A retired Deputy Sheriff met one of these people when he brought me Richard Stanek yard signs.

73. My neighbor, Jeff Sorenson, may be a Police stool pigeon as perhaps Jason, the owner of Caibert Real Estate Solutions. I look forward to what seems to be a set up with Jason at Target tomorrow.

74. Another incident occurred when I was called to replace a rooftop air conditioning condensing unit fan. When I went to Electric Motor Repair (2010 North 4th Street) they had the motor I needed on the counter. After installing it is was obvious from the noise you could hear from street level that a bearing had failed. I spoke to the owner of the company and the motor was replaced at no charge.

75. Just as how I have wondered how the motor I needed was on the counter, I have wondered how the glass dimensions were incorrect. Granted, HVAC repair and tempered glass are covetous jobs. It could be that someone just did not want me working in those fields. But to have gotten the wrong dimensioned piece of tempered glass from Brin Glass is shocking. I am good at doing things like taking measurements. I have had years of experience at such things, and the "atmosphere" in the Brin Glass willcall desk room was nothing other than toxic. Later phone calls to the sales person who took down the measurements when I ordered the glass were deflected. I could not get her on the phone; she was always busy at something else.

76. A truck that appeared to be an HVAC service van was being parked in the GSA restricted are of the parking ramp in my final weeks as an employee at CMC & Maintenance. I have often wondered if the sudden transfer of Chris Kawaters to St. Paul, who was the U.S. Marshal Service Minneapolis Chief Deputy didn't have something to do with my employment and dismissal from CMC & Maintenance. Did the Marshal Service demote Chief Deputy Kawaters?

77. At about the same time but following my dismissal the appointed U.S. Marshal Sharon Lubinski left the Marshal Service. There are only 94 U.S. Marshalls; it would seem being a U.S. Marshal would not be a job a person would leave after a short tenure. I may be excessively estimating the consequence of

my effect on the U. S. Marshall Service bureaucracy, but the timing of the departure these two individuals made from prestigious posts is conspicuous and noteworthy.

78. Reaching out to attorneys to represent me has been responded to with silence after an initial consultation, and then a refusal to consider my complaints further because of how other client obligations would suffer.

79. In about 1975 I disenrolled from studies at the University of Massachusetts, Amherst Campus and voluntarily admitted myself at the Northampton, MA VA Hospital. I was overwhelmed with studies, financial difficulties, and the sudden, unexpected departure of a girlfriend. I was very briefly an inpatient at the VA Hospital.

80. I am in the impossible situation of having voluntarily gone to a mental institution for help during a trying time of my life, and then having it turned against me. Had I turned to drugs, alcohol and crime, and then be reformed, I would be a model citizen. My decision to seek help quickly is used against me, I for that I am put in the impossible situation of having to disprove negative assertions about my mental health.

81. In 1991 at the advice of my Mother I went to the Minneapolis VA Hospital for depression. A VA document called the "Supplement Defined Database" was written about me in 1991. I dispute the premise of the document and believe it to have been somehow incentivized by the Minneapolis Police. The statements of the 2nd page (backside) in the middle of the page do not describe me fairly.

82. I have a temper, and in the 1970s I did have angry outbursts, but those events were isolated and occurred during in extremely stressful moments. There was never sustained violence, although I did strike Donna (Shipski) Rush. I am deeply regretful of having driven her away. The outbursts were wrong but have been non-existent for the past 44 years – since I voluntarily went to the Northampton, MA VA Hospital in fact.

83. It has seemed on several occasions I have been intentionally been subjected to stressful situations that seemed to have the intent to provoke an outburst – and such outburst has never occurred since going to the Northampton VA Hospital in about 1975.

84. Three times I have been stopped for no reason or a fabricated traffic stop by a member of a law enforcement agency: Once by a Minnesota Highway Patrolman and twice by Minneapolis Police Officers. Two of these stops were notable in that the law enforcement Officer proceeded to confront me provocative manner. In the third I was issued a traffic ticket for broken taillight that was in fact undamaged. Upon my contesting the violation in a hearing it was dismissed.

85. Three times I have been fired from employment, and these three dismissals were conducted in a humiliating, degrading manner that it would seem the intent was to provoke a confrontation outburst, or at least alienation and estrangement.

86. I have been unable to establish whether Jane Rinehart, the Staff Psychologist who wrote a so-called "Supplement Defined Database", is still at the Minneapolis VA Hospital. This is a terrible description of my psyche, a description that was not then, is not now, nor has ever been defendable.

87. Likely the result of the "Supplement Defined Database" was the prescription of Haldol, an antiquated antipsychotic with potentially debilitating side-effects. This was an inappropriate diagnosis and medical regime of care.

88. I will describe the two Doctors I remember who attended to me at the time I went to the Minneapolis VA Hospital for help with depression: When I started hearing inappropriate allusions of my mental health, I recalled a physician who I had seen during a visit to the Minneapolis VA, a Dr. Robert Falk. Dr. Falk was transferred to a mountain State VA Hospital shortly after I met with him, perhaps only after I terminated my association with the VA in 1992. I reached him but as we talked the telephone was disconnected. I distinctly remember Dr. Falk's reservations about the treatment regime while I was an outpatient at the Minneapolis VA Hospital.

89. I do not recall the second physicians name, other than I saw him only once and that he was very old. It must have been him who prescribed the Haldol medication.

90. I stayed away from the VA Hospital for 26 years. In 2017 I thought it best for me, with respect to my financial situation, to have a cyst removed by a VA surgeon rather than a Medicare physician.

91. Retrospectively, from my first visit to the clinic to see a physician I now see something was wrong. Although the surgical procedure went well, other parts of the episode were fraught with disturbing problems: I became violently ill after presurgical blood-work was done.

92. The Nurse Practitioner who supposed to remove the stitches did not remove <u>all</u> the stitches, and he was accompanied by one or two persons who he did not introduce when he removed what stitches he did remove. He did not tell me he had left stitches in the back of my neck.

93. This Nurse Practitioner knows who my stalkers are inside the VA Hospital. Of course, law enforcement monitors hospital intakes. One or two of my stalkers accompanied the Nurse Practitioner into the examination room when the stitches were partially removed.

94. After two or three weeks I went to the VA Emergency Room because I realized something was wrong. I took a picture of the back of my neck, see attachment number 3. The Emergency Room physician removed two, three, or four stitches.

95. One or two days following having blood drawn in the Minneapolis VA Hospital Phlebotomy Clinic I became extremely feverish. I was unable to work for a full week, and not well for another week. I had gone to the Phlebotomy Clinic mid-afternoon. Although it was busy, I am sure others who arrived were taken before me. When I walked into the bloodletting clinic, I was immediately struck by the person who was to take my blood. He was a not-yet middle-aged man, overweight, and not well kept. All the other phlebotomists I saw were young women. I do not watch the blood taking process, but I recall him using a syringe, but not withdrawing blood with it. But nor did he fully empty the contents by fully pushing the plunger. Like how he inserted the vails that took blood samples, he inserted the syringe

into the butterfly winged needle device. I was mildly suspect of the purpose of the syringe and it being atypical of previous blood-sampling procedures but trusting that the medical professional I thought I had was doing what he was supposed to do.

96. The first or second day after becoming sick, which would be the second or third day after the visit to the phlebotomy clinic, I called the VA patient inquiry line and spoke to a nurse. This call would be documented in my cellphone records. The nurse probably did not understand, nor ever suspect, the importance of my inquiry. She only told me to inspect the site where the blood was taken from.

97. I have interpreted the prescribing of Haldol to be with intent to disable me, and the potential that the sickness following the blood sample to have the potential to kill me at worst or scare me at least. I attribute both events that are described here to Police who monitor Hospital admissions. I am suggesting that perhaps individuals employed in law enforcement have formed personal relationships with medical staff in the VA Hospital, and maybe others as well, and as a result of that personal relationship, may have incited the use of a syringe and injected an unknown substance into my blood stream as well as corrupting the treatment for depression I initially went to the VA for in 1992.

98. Again, and again, I have trusted, wrongly trusted, and assumed all would be well.

99. On another visit to the VA Hospital Emergency Room very shortly after the removal of the cyst, Monday, on Memorial Day, 2017, when I observed excess fluid seemingly accumulating in my left upper forearm. I was afraid something was very wrong, perhaps sepsis. The same Nurse Practitioner who had not removed the stitches from the back of neck was the attending Emergency Room medical professional. A young man, a military Reservist medic I believe, was the designated phlebotomist on that day. I inquired with him about the use of the syringe during taking a blood sample but did not get an affirmation that having a syringe was appropriate.

100. Not trusting the Nurse Practitioner, I walked out of the Emergency Room refusing to be seen by him. Later he called me on the telephone. I asked him what he intended to do. He was going to

prescribe me antibiotics that I found by researching later were appropriate for treatment of sexually transmitted diseases, and likely not for fluid building up in an upper extremity.

101. On the following Tuesday or Wednesday, as soon as I could get in, I saw a physician at the VA. The antibiotics prescribed by the medical doctor were different from those the Nurse Practitioner had intended to prescribe.

102. Recollecting severe fever and sickness following the visit to the phlebotomy clinic for the presurgical blood-work, I thought I should inform the VA Hospital. I tried to describe the experience to a Patient Advocate, a Mr. Paul Gunning, at the VA who said nothing and walked me out of his office not documenting my visit. He had only scrolled through my medical records on his computer. He has since been dismissed or transferred.

103. When I followed up with another Patient Advocate, first name Gemima (last name unknown) she simply told me to go to somewhere else for medical care. That Patient Advocate, first name Gemima, has also been dismissed or transferred.

104. I am carrying the Medica Advantage Solution (PPO) in addition to Medicare. I hope for the remainder of my life I can stay away from the Minneapolis VA Hospital. I will do my very best for the remainder of my life to stay away from the Minneapolis VA Hospital. The Minneapolis VA probably maintains a killer on staff.

105. Some months later I had chest pains. It turned out to be a pulled muscle, but at the time I considered it could be a heart attack. I went to the Methodist Hospital Emergency Room. While there the nurses changed from caring professionalism to suspiciously hostile.

106. I have had concerns that all my future medical care could be jeopardized. While there has been no unprofessional or a lack of care and the mindfulness and solicitude was unfaultable at the Methodist Hospital, the way the attitude changed between the time I was inducted to the Methodist Hospital and when I was being treated was unmistakable. The obvious objective professionalism and clear-cut

competence became cautious, anxious, and maybe even fearful. My medical records circulated among hospitals may be corrupted, as well as possibly illegally shared.

107. While of course hospital Emergency Room staff need to be protected and aware of patient histories, corruption of medical record histories is unpardonable.

108. Recently while providing services to a the Conflict Resolution Center (2101 Hennepin Ave, Ste. 100, Minneapolis, MN 55405), the Office Manager, named Paula, said something about John Nowicki, the owner of Information Reporting Services, Inc. (IRSI, 2nd Floor, 2101 Hennepin Ave., Minneapolis, MN 55405 said something about a background investigation. I fear that false or misleading information not available to me is being circulated. This is very upsetting.

109. My employment records could also be tainted. I must wonder if a potentially illegal source of information, perhaps a website, exists that has information job that would wrongfully influence an employment decision concerning jobs I could have had exists.

110. There were for years seemingly malicious rumors about my having a mental disability. Comments have come unexpectedly and from varied sources, both social and professional. Meddling for the purpose of beleaguering is obvious. Neighbors, coworkers, social acquaintances certainly and frequently seem to have been prejudiced. I can provide names and descriptions of instances but I think the record should be sealed.

111. More recently comments have been made about my abuse or wrongful use of young women have been made. I took these comments as being directed at me.

112. Anne Marie (Smission) Anderson and I have been friends for more than fifteen years. Through a Church Anne Marie introduced me to Lynne Torgerson. Then I became better acquainted with attorney Lynne Torgerson in political settings. A phone text attorney Lynne Torgerson sent me was inappropriate. See attachment number 4.

113. In attachment Attorney Lynne Torgerson makes direct, unquestionable insinuations about my mental health, specifically alleging that I have schizophrenia and should be on medication. She also seems to indicate I am a threat to her safety. I do not have this attachment in electronic format.

114. Anne Marie told me about abusive and insulting behaviors Ms. Torgerson had directed at her. Anne Marie's comments to me seemed to cause Anne Marie to question her own self-worth and intelligence. I wrote Ms. Torgerson a letter expressing so. The letter was respectful and only described my assessment of Anne Marie's comments. Ms. Torgerson responded to my letter in a cellphone text format. Please see attachment number 4 and read her indelicate instructions to me.

115. Concerning Anne Marie's comments about the attorney at law Ms. Torgerson, Anne Marie once said something to effect that she would never participate in anything unethical concerning me. In fact, Anne Marie apparently thought attorney Ms. Torgerson's comments were significant enough for her to contact me after we had not spoken for several years. More recently Anne Marie has indicated she has had another meeting with Ms. Torgerson.

116. Now retired attorney Bill Seeley, Seeley legal services made several comments about my mental health. Like I have done so often, I took a continuing education courses for self-improvement. Now retired attorney Bill Seeley was at that time the Adjunct Instructor at the University of Minnesota Department of Continuing Education. After the class I remained in touch with Bill, and even did some work at his house in the Prospect Park neighborhood. By what circumstance did my mental health be communicated to attorney and adjunct instructor Bill Seeley?

117. The rumors about my mental disability seem to be habituated to provoke a violent reaction by me that can be dealt with forcefully. There have been three vicious, provocative job dismissals. The last and worst being the unjust and uncalled for dismissal from CMC & Maintenance, the GSA contractor for building operations in the Minneapolis Federal Court House. The others, one at the Hines Company in the late 1990s and the other at Purina Mills in 1991.

118. In the week or weeks preceding my dismissal at CMC & Maintenance I had confided in my immediate supervisor, Jeff Broman, about concerns I had had concerning sabotage of work I had done in the Minneapolis Federal Court, as well as having called the CMC & Maintenance Employee Hotline and speaking to the owner of the company.

119. Although persons who had first answered my call to the Employee Hotline wanted me to tell them the reason for my call, the information supplied with the Employee Hotline said I could speak to the company owner, and I insisted I should do so. I finally did reach and speak to the company owner.

120. Shortly thereafter I was viciously dismissed, seemingly with the intent to provoke a reaction. U.S. Deputy Marshals had been posted outside the door and my every word was recorded. I walked away from the Minneapolis Federal Court House and started over working for myself again.

121. The 2-year statute of limitations has expired for my challenging the validity and justifications for dismissal in three and possibly other dismissals. However, the dismissals are not the subject of this pro sé litigation: The subject of this litigation is the denial of my Constitutional rights by retaliatory law enforcement agents from the Minneapolis Police Department and a Federal agency most likely to be the Minneapolis FBI.

122. I have become a critic of Police misconduct and abuse of authority, frequently communicating in writing with Minneapolis Councilpersons, past and present Mayors, State Senators and Representatives, former Attorney General Lori Swanson and others and their staffs. I have urged scrutiny of inappropriate Police powers and behaviors. As would be expected, I am sure this has not been taken well.

123. When it was reported in the Star-Tribune the Assistant Chief Kris Arneson was retiring in the spring of 2017 I expected the harassment and intimidation to increase. Harassment, intimidation, strange observations, and curious coincidences did shortly begin to occur and seem to persist to this day.

124. Not unexpectedly, my efforts to become an elected official in local or state government have failed. I maintain active and often carry on correspondence with policy makers.

125. I believe third party persons have been suborned by Minneapolis Police or agents from other law enforcement agencies and have on occasion been harmed.

126. I allege I have been stalked, and the stalking very likely began in Seattle, WA when I lived there. I have clear memories of incidents that happened in Seattle that are very similar to those that seem to be happening here in Minneapolis. It would seem the Seattle experience-equivalents with the Minneapolis Police undercover elements of the so-called Community Action or Community Response Teams here in Minneapolis were scrutinizing my activities in Seattle before I moved back to Minneapolis, my place of birth and where my family is.

127. Allegations seem to rumor that I abuse or misuse young women. It is not true. I have great regard for the feelings, wishes, and rights of all women, but especially those young in years. The problem, and perhaps by accident I have inadvertently put myself in a position where a young woman may have trusted or assumed, I would instantly respond as a protectant or provider. I could not, I had my own problems to contend with.

128. Retrospectively considering situations in Seattle during that difficult period in my life I can see how my actions could have misinterpreted, but other than not becoming the protectant and provider I wish I could have been, there was no behavior I should be ashamed of on my part. I have thought about two young women in Seattle and wonder how they are doing today, especially the one who was less fortunate and privileged. They worked at what was then called Kinko's copy shop and now called FedEx Office. I used copy machines for my studies and the rental computers Kinko's had. This was in 1988 and 1999, and I could not afford a computer at the time.

129. In retrospect I can see reason to believe Police stalking by youthful undercover teams began in Seattle. The more fortunate and privileged Kinkos employee, whose name I recall as being Heidi, was

placed in my full view as I had a coffee in a Montlake Park neighborhood coffee shop on an early weekend morning. Being friendly I greeted her, and she introduced me to three young men that she said were her friends. This girl certainly outclassed those characters, and their grinning countenance was thoroughly disturbing. I immediately left the coffee shop.

130. I found us in similar unexpected proximity another time in a grocery store when I was on a date with another, older woman. Outside of those two encounters which upon reflection must have been staged, I never had anything to do with either girl outside of their workplace, and that being observed by co-workers.

131. I was experiencing employment frustrations and job opportunities had been saddening; I was in a different part of the country from where I had lived for a very long time; and I had just recently suffered through an unwanted divorce. A tour of temporary active duty as a Reservist in the U.S. Coast Guard Reserve had been disappointing. There was very little optimism in my life at the time.

132. I first became aware of scrutiny by Minneapolis Police for about twenty years ago. It became obvious that someone was toying with me when I began finding playing cards, half-burned newspapers and other unusual items in my driveway (See attachment 4).

133. The repeated observation of a truck very nearly identical to my own, complete with a home-made ladder rack, was not only startling, but alarming. Finally, the red Dodge mid-1980s pick-up truck was abandoned at the end of my block in full view from the alley. Like so often, an odd observation or experience is followed up with an obvious instance of display of arrogance and intimidation.

134. This is bullying in the worst sense. but is worse is that the persecution I allege has led to losses of third-party individuals who were misled. Persons to who would not have gotten involved unless they made assumptions about the integrity and justifiable objectives of law enforcement persons have been harmed. Sometimes it appears they are complicit; and sometimes thoroughly oblivious.

135. Law enforcement supervisors must perjuriously influence subordinates. The original Officer with whom I had the confrontation with, and his supervisor at the time, have retired.

136. For the most part I ignored the persecution, but recently it has gotten extreme and must be addressed. Now, at 69 years of age, I am less able to recover from setbacks. The obvious signs of medical treatment corruption and the potential that employment record corruption has bedeviled my career aspirations is worthy of investigation. The youthful members of Police undercover groups seem to fail to understand the seriousness and profundity of their actions.

137. A few years ago, while going to make a social call on now retired attorney and neighbor Bruce Rasmussen I mistakenly went to the wrong building. Bruce has an apartment in one of three identical buildings on an avenue one block away from my home. Amazingly, the name on a mailbox of this identical next door building to Bruce's was the name of a former tenant of the duplex which I own on a contract for deed with my brother.

138.. Her abbreviated name is France Barbou, and I had been acquainted with her during the time of the fraudulent taillight ticket incident. Ms. Barbou was a server at the first Spyhouse Coffee shop on 25th Street and Nicollet Ave. Ms. Barbou and another young woman applied for and had rented the upper apartment together. That was the first coincidence involving Ms. Barbou, discovering Ms. Barbou's name on identical building to Bruce's the second.

139. I had asked Ms. Barbou and her roommate to move away because of the curious problems that were occurring in their apartment. They obliged my request. The appearance of Ms. Barbou was perplexing, but she and the other woman, named Elizabeth Gr........ski, seemed as if they would be good tenants.

140. I have been aware of Police scrutiny, harassment and persecution for many years, and hoping that Ms. Barbou could provide testimony affirming this, mentioned to someone who seemed to be a

resident in the same building my former association with Ms. Barbou. This was in the middle of the month, and by the end of the month the apartment Ms. Barbou occupied was empty.

141. Reviewing my duplex records I find that the renters CRP forms for both Ms. Barbou and Ms. Gr...ski are missing. Another document, my Coast Guard Reserve ID card, is also missing from the location I had been storing it. The ID card had some sentimental value.

142. There have been indications that my home has been invaded, and the absence of these documents, as well as malicious damage, tends to confirm this. It seems the bed was broken, the sinks plugged, and damage done to house fixtures on one such invasion.

143. My serious fear of mine is that over the years and before her death my Mother was misled. Although the surgery after breaking her hip was successful and recovery was expected, she stopped eating and died. Although pneumonia is listed as the cause of death, she had not eaten in more than a week. She died six months before her 90th birthday and a granddaughter's wedding.

144. They won't go away; they won't leave me alone.

145. It appears the methods used by law enforcement have been to gain confidence, then deceive, exploit, and betray. There have been numerous incidents, three of which seemingly intended to provoke a violent reaction during undeserved job dismissals, and three others where Police Officers have confronted me in an inflammatory manner.

146. There is an intent to deny me the ability to provide for myself and cause social alienation.

147. Too often there are requests for services outside of my trade, HVAC & R (Heating, Ventilation, Air Conditioning, and Refrigeration). I am not a plumber or an electrician.

148. Perhaps people will be voluntarily induced to come forward and testify about the complaints I make. However, it may be necessary to protect the identities of persons who come forward lest they suffer from the same persecution that I have endured, specifically losses the cause of which are unknown and obscurely veiled, but nevertheless significant.

149. This complaint is a limited description of my complaint. Documents more fully describing the scrutiny, harassment and persecution are available and should be sealed, even from the U.S. District Court staff, if the Court wishes to review them. Upon the invitation of a Federal Judge I will finish and submit significantly more detailed information.

150. Of course, without supporting testimony it will be difficult or maybe impossible for me alone to prove to the Court much of the harassment and intimidation occurs because I am the only witness. The stalkers simultaneously gas-light, goad, intimidate, and attempt to provoke, while law enforcement supervisory staff deny these activities.

151. Despite my broad experience and excellent credentials, the difficulty I have had finding employment leads me to suspect derogatory or damaging official or unofficial documentation exists that has hampered my ability to succeed.

152. There have been comments and actions by Human Resources department persons who have supported this. However, this could only be confirmed by an active Human Resources representative familiar with current prospective employee evaluation proceedings. Over the years the thought that my record, official or unofficial, has been tainted certainly has occurred to me many times.

153. I could not make this story up. You could not write fiction this good!

154. I am not without blame, but my intent has never been to deceive, corrupt, harm, or abuse. After years of tolerant acceptance and ignoring the persecution, I have in moments of exasperation been ill-mannered and impertinent expressing my frustration.

155. I have a great deal of respect and empathy for uniformed Police Officers; it is the non-unformed, undercover, especially the youthful new hires who appear to be insufficiently supervised or wrongly influenced. I suspect senior Police executive management has chosen to remain willfully ignorant of subordinate behaviors or, worse yet, coordinate suborning or misdirecting subordinates. If this is what has occurred, it would be extremely egregious.

156. There is a great deal more I could include in this complaint, but I will refrain from doing so at this time. First, I believe revealing the identities of people who could testify in my behalf could be intimidated or further misled. Secondly, describing incidents in this complaint reveals the incompetence, arrogance, mismanagement, and lack of training in Police behaviors. Until the wrong-headedness of Police tactics is revealed, they have no incentive to improve their efficacy in legitimate operations.

**157.** In this litigation I hope to determine who has been persecuting me and mitigate the damage done to my reputation and past employment opportunities. I am 69 years old now, and if proven to have existed, persecution by law enforcement, crime prevention, and investigatory persons has been a serious impediment to my financial success and personal life satisfaction.

158. I wish to insure the Minneapolis VA Hospital adequately investigate my allegations of malfeasance and potential that they may have a man who might be a killer on staff.

159. I believe a few Officers who are members of the Community Response Team have been gas lighting me and administering extra judicial punishment. The obvious and targeted behavior must be an open secret among CRT members, and a few uniformed Officers have seemed aware of it by their actions. Over the years I have seemed to have become a butt of jokes and object of entertainment. Often it has appeared the objective has been to remove ability to provide for myself and alienate me from normal social interactions.

160. Specifically, it <u>may be</u> law enforcement undercover plainclothes Officers spreading rumors of my abusing or using young women. The motivation for spreading these rumors might have started when Richard Zimmerman went to western States after I moved here. While I lived in Seattle, WA I saw indication I was a person of interest by three young men who must have been in a Seattle Police Department Unit equivalent to our Minneapolis Community Response Teams.

161. Recently Amelia Huffman was promoted from 5th Precinct Community Response Team supervisor to 5th Precinct Commander. Replacing her as CRT supervisor in Huffman's words "a very experienced Lieutenant".

162. Mail addressed to me has not reached my mailbox. Inquiries at the Post Office have been deflected, but not without unusual responses from supervisors.

163. I suspect a concerted, intentional on-going program with the intention to destroy me using resources intended for law enforcement and crime prevention has been implemented by individuals in the Minneapolis Police Department.

164. I believe there are people who will testify in my behalf, but to protect them from harassment may require subpoenaing them and sealing the Court records.

165. Since it has been suggested that my stalkers are female homosexual employees in the Minneapolis Police Department the current female supervisor of the Minneapolis Police Internal Affairs unit may or may not permit a legitimate internal investigation. Therefore, it is my desire to move my complaint directly to the Minnesota Federal District Court.

166. Occasional interactions with neighbors and acquaintances have indicated that they have been tainted by comments about me.

167. I have been wrongly and viciously dismissed from employment; one wrongful termination occurred in the Minneapolis Federal District Court House. In the workplace I have seen where something seemed inappropriate.

168. Realizing that I might never be treated fairly in the workplace because of law enforcement agency meddling I started working for myself, and now I suspect my customers have also been meddled with.

169. I own on a contract for deed from my brother a duplex, and I am certain tenants have been suborned to make managing the duplex difficult and on occasion damage the property.

170. When I went to the Minneapolis VA Hospital for help with depression it appears the Minneapolis VA Hospital was influenced to change to the treatment regime to treatment for psychosis. I was prescribed Haldol, an ancient drug with the potential for ruinous side effects. Fortunately, my Mother, and LPN, took the medication away from me and I never took any of it. I stayed away from the VA Hospital for 27 years, but when I went to the VA for financial reasons to have a cyst removed from my neck it appears there may have been an attempt to kill me. When someone unlike the other phlebotomists drew my blood, I noticed he used a syringe in addition to the blood sample vials, but he did not inject the full contents of the syringe. The next day I became very ill and was sick for a week and not feeling right for another week.

171. There has been computer and cellphone problems that indicate that someone with considerable experience assists. Settings and switches on my cellphone (Android operating system) have been changed almost as I watched, files have disappeared from my C: drive and a program called simply "G" has prevented an orderly shutdown.

172. I have worked with and followed the advice both T-Mobile and Microsoft with varying degrees of success terminating the electronic harassment.

173. The avenues that may have been used is through the social contacts of more youthful CRT members, and my involvement in the dance companies and schools as a vector into this community in

which I have participated in for twenty-five years or more. This has not been incidental involvement. Rather

174. My understanding is that Amelia Huffman was the previous CRT supervisor and the current supervisor would be aware of the harassment and attempts to intimidate me. During a 2018 5th Open House I talked to previous Precinct Inspector Kathy Waite to no avail. Over the years I have spoken to innumerable Police Officers, politicians, and bureaucrats, only to see the stalking intensify. I ran for office several times not only for my own interests in correcting misguided law enforcement, but for the other "targets" the Minneapolis Police may choose.

175. This abusive treatment began in 1992 after I had a dispute with Richard Zimmerman. A letter I wrote to then Minneapolis Councilperson Sharon Sayles-Belton is included with this form. Shortly after I wrote this letter Officer Zimmerman made trip to out west somewhere, probably to get dirt on me after I had moved here from there.

176. The 3 years I lived on the west coast were troubled. I had been recently divorced, had constant employment difficulties, but I have nothing to be ashamed of and am guilty nothing.

177. Upon making the grievous mistake of returning to the City of my birth and where my family reside when I went to the VA Hospital for depression, the diagnosis was changed to a paranoid disorder and a powerful, ancient, potentially disabling antipsychotic drug was prescribed. Twenty-three years later there is a remains the question if not an attempt to kill me with an injection occurred when blood samples were taken. Of course law enforcement monitor hospital intakes.

178. Perhaps I had gotten the attention of the Seattle Police Department because of my habit of studying in University District coffee shops and restaurants. Having graduated from the University of Massachusetts with a B.S. in Mechanical Engineering I thought I could improve my employment

opportunities. Study did not, in retrospect I see my handicap being 38 years old, having and engineering degree, but no professional employment experience.

179. I was very friendly with young people who worked in the restaurants and coffee shops and the University District Kinko's, now called FedEx Office. I never saw any of those girls outside the FedEx property except for what now appear to have been arranged meetings.

180. An 18-year-old youngster named Heidi showed up unexpectedly twice in my proximity, once introducing me to three young, grinning men she referred to as her "friends". I think these "friends" were Seattle equivalents to our Community Action Teams.

181. The other girl whose name I cannot remember stopped me in the middle of a busy University District street and said she needed a place to stay. I immediately refused for her to stay at my house because I had enough problems than to have an 18-year-old living in my house. Now, after years of thought and reflection, I regret that spur-of-the-moment decision, but it would have been a difficult situation.

182. Most recently there has been meddling in my mail delivery, and everything I believe Minneapolis Police who monitor local area hospital intakes and medical consultations have

183. As I type this a "SAVE" pop-up window persistently prevents typing. This is indicative of real time computer hacking I suspect is occurring. By disconnecting my internet connection, it has ceased.

184. I have been going to the MOA Microsoft store for computer problems. It certainly seems like they have been "infiltrated" by corrupt law enforcement agencies. I was there on 8/13 and was urged to bring my computer in.

185. I though I was having a heart attack one night, but it turned out to be a pulled muscle. Having a Medica Medicare Supplementary Health Insurance Policy so I do not have to go to the VA where I might

be murdered, I went to the Methodist Hospital. Suspecting that the treatment would be corrupted I immediately told the ER nurse that I had had a conflict with a Minneapolis Police Officer and to expect corruption.

186. She became upset, but professionally did her job. When I left she and the other nurses had collected outside my curtained bed.

187. Another nurse had come in and partially taken off the sensors on my body but left some on my chest. When I called her back, she removed them and then dropped them on the floor and left hastily. The Doctor was more stoic. I have discussed this with my Medica Primary Care Physician, Rachel Ackenburg.

188. As there has been a pattern of meddling with my employers, so has there been a pattern of meddling with my customers when I am self-employed and Minneapolis Regulatory Services by whom I am licensed by.

189. For a few years there was interference when I would be purchasing my business licenses from Licensing and Competency Cards from Regulatory Services. Competency Cards are a bureaucratic method of favoring certain companies by restricting entry into the Minneapolis HVAC market.

190. One time when trying to obtain my company documentation I was sent to the third floor of the Public Services Building and told to wait in the hallway. A younger blondish woman stylishly dressed in cargo trousers and utilitarian top came out of a door. She was amused, walked around me, and then told me to go back downstairs and pick up my documentation.

191. John Smoley in the Heritage Preservation Commission division of Regulatory Services once called me with dismissive information about a permit I was trying to get. Previously John and I had been good friends, but he was different now. The next day I wanted more information and called the number on my cellphone from where he had called; the call was answered by the voice messaging system of Commander Kim Lund.

192. Commander Lund, I believe, offices at the 3rd Minneapolis Police Precinct. It is from the 3rd Precinct the stalking I allege originally originated, but now with the appearance of Commander Amelia Huffman in the my Precinct the 5th Minneapolis Police Precinct, as well as the so-called "very experienced Sergeant" who was referred to by Post Office supervisors, seems to be coming from the 5th Precinct.

193. Note that there were not any Police stalking indications coming from the 5th Precinct when Kathy Waite or Chris Arneson were there. Stalking indications began immediately when Amelia Huffman was assigned 5th Precinct Commander, but I think covert stalking was occurring in her previous assignment as 5th Precinct Community Response Team Supervisor. With the prevalence of woman Police Officers and Richard Zimmerman I consider the City of Minneapolis's experience with former Minneapolis Fire Department Bonnie Blaskachek.

194. Before his retirement from the Hennepin County Attorney's Office, I received a letter directing me to get in contact with Mike Atkinson. I did so, and during one of the few conversations we had he said, "I will not put an innocent man in jail". Could he be persuaded to describe the details of what the thoughts were that led him to make such a statement?

195. Chief John Laux dispatched Richard Zimmerman to western States, presumably to get background information on me. I now recall exchanges with what must have been plain-clothes, undercover youths employed by the Seattle Police Department.

196. In 2017 I went to the VA for a minor walk-in surgical procedure. There were several unusual experiences during each visit to the VA, the worst occurring during presurgical blood work. As blood was being taken, I looked directly at a syringe that was being used in addition to the blood sampling vials. The person noticed I noticed and did not push the syringe plunger and empty its contents into my arm. The next day I became extremely sick and was very sick for one week and it was another week before I could work.

197. I believe a program of unofficial of extrajudicial punishment without the legal process by continuous phony investigations, rumoring, and gas-lighting has been carried out for the last twenty-nine years. Most recently several pieces of important mail has not reached me. Now that I am 69 years old and more vulnerable the vicious targeting has not quit.

198. I think I know who as a group is stalking me, and the mechanics of the process my stalkers use to torment me. I think it may be a group of homosexuals employed in government, and they use other knowledgeable or properly positioned homosexuals from the private sector. This network has the resources to cause me considerable problems.

199. I wish for the City Attorney's Office to remain passive if it becomes necessary I appeal for injunctive relief from Minneapolis Police stalking and harassment. I think I may be able to prove misconduct and abuse of authority by certain Minneapolis Police. There are citizens who have questions in their minds about what they have been told, but they have also been told that if they tell me anything about on-going questions they may have been asked by investigators they may be prosecuted.

200. Repetitively there have been indications that the so-called "Community Response Teams" have implemented most of the harassment, intimidation and gaslighting. On more than one occasion I have observed a group of individuals taking interest in me – laughing in fact!

201. After being encouraged to apply for benefits with the Veteran's Benefits division statements were fraudulently composed and kept hidden from me. I withdrew the claim.

202. After being cruelly humiliated during the dismissal in front of the entire evening shift in a staged termination hearing the Purina Mills General Manager was transferred in the middle of the school year to a smaller, southeastern United States animal food plant. When they contested the $1200 or $1800 in unemployment benefits, I received I appealed all the way to the St. Paul Federal Court.

203. Federal agents defiled that temple of justice - the Minneapolis Federal Court House - who else would have had immediate access to the 7th floor Secret Services Offices? A guy I call the "grinning jimmy" gave it all away. I gave up the will to remain employed by CMC and Maintenance, the GSA contractor providing building operations services in the Minneapolis Federal Court House, when I grinned as he walked by me as I worked on a 7th Floor drinking fountain. Two younger men came out of the elevator lobby chirping, "jimmy, jimmy", and all three disappeared into the Secret Services office.

204. Private property has been damaged to disable self-employment and poison customers, phony traffic stops, and employment dismissals engineered precipitate a confrontation, interference with counseling for depression, meddling and rumoring in social circles to suppress any interpersonal relationships. How much more sick can this get?

205. It does get worse yet – they may have motivated their stoolies to poison my animals, hack my electronics, sabotage work I had done and maybe my vehicles. My cat walked into the house and died; the dog was sick about the same time. He is better now, but I was very worried. He lost 14 lbs.

206. I am convinced they inspired an on-demand killer in the VA hospital to attempt to kill me. The only reason I may yet be alive is that he lost his nerve and did not empty a syringe into my arm as I looked at it.

207. I have accidently found cards from Plumbing Inspectors in the mailbox at 2620 Stevens Ave. I manage the property, a up-down duplex. I and a plumber have outstanding permits out on the building. The first card was a CGI (Can't Get In) from Plumbing Inspector Trevor Oglivie. He could have called me.

208. A second card was mailed by Plumbing Inspector Stacy P. I called her when I found the card. She never called me, but did call Steve (Larson?), Regency Plumbing, who has the Plumbing Permit. I have the Gas Permit out through my company, Bruce Arnold Mechanical. Stacy P. has told Steve that we have 45 days to close the permit. I don't understand why she would not call me.

209. When it appeared Plumbing Inspector Trevor Oglivie had rumored in the downtown Regulatory Services staff that I had removed stoves from the 1500 Park Avenue apartment building I advised Ethics Officer Susan Trammel, City Attorney's Office. Apparently, the owner of the buildings Maintenance Manager had told Inspector Ogilvie that I had removed the stoves. It is not true, I had not, but Inspector Ogilvie did not have checked with me because this is a very serious claim and would hurt me.

210. A few years ago I was trying to get the attention of the City Attorney Ethics Officer and was told that I had sent XX number of emails. It was inferred that my appeals were not appreciated so I stopped.

208. There is more, I just have not yet recalled it.

Attachment #1



June 16, 1992
2620 Stevens Ave., S.,
Minneapolis, MN 55408
872 6378

19cv3115 DSD/BRT

RECEIVED
FEB 13 2020
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Sharon Sayles Belton,
Councilperson,
City of Minneapolis

Madam:

Late yesterday I spoke to Vernon Wetternach in your office. He encouraged me to write you concerning an incident that occurred involving me and a Patrolman of the Minneapolis Police Department.

After three weeks of trying to contact him, twice Patrolman of the 5th Precinct Community Action Team first threatened me with his intention to sue me in court and then hung up the phone. This occurred during normal working hours and on the 5th Precinct C.A.T. phone line, 348 9350.

After those two events I immediately went to the 5th Precinct and endured similar treatment in the Precinct lobby. After Patrolman stormed away his supervisor, Sgt. stepped in. At her request we went outside on to Nicollet Avenue, discussed the matter quietly, and I left.

There is a complicated series of events that led to my wanting to speak to Patrolman but that is now irrelevant. That matter will be settled in court latter this summer. I am naturally concerned about these suing threats and the inability to communicate with Patrolman while he was on duty.

It seemed as though his Sgt. was concerned, and his fellow officers who were present in the lobby are likely to be questioning his behavior toward me.

To be sure, the legal matter in which I am involved would have very likely been avoided had phone calls been returned or messages left at the desk followed up on. Although Patrolman was implicitly involved, that is behind us now.

I am not asking for your assistance, just making you aware of what happened for my own protection.

Respectfully yours,

Bruce A. Lundeen

What compelled me to go to the precinct was the Officer telling me "I will own your house."

77

SCANNED
FEB 13 2020
U.S. DISTRICT COURT MPLS

ATTACHMENT #2, front side JR.

Veterans Administration

**MEDICAL RECORD** | **SUPPLEMENT DEFINED DATA BASE**

SUPPLEMENT TO STANDARD FORMS (Check on): ☐ SF 504 ☐ SF 505 ☐ SF 506
SUPPLEMENT TO VAF 10-7978g SERIES (Check one): PART ☐ I ☐ II ☐ IV ☐ V

| PREPARED BY (Signature & Title) | SERVICE | DATE |
|---|---|---|
| JANE RINEHART, Ph.D.<br>Staff Psychologist | MENTAL HEALTH CLINIC | November 13, 1991 |

PSYCHOLOGICAL TESTING REPORT

Tests Administered: Biographical Data Sheet (BDS), Shipley Institute of Living Scale, Michigan Alcoholism Screening Test (MAST), Minnesota Multiphasic Personality Inventory-Revised (MMPI2)

Date Administered: 11-6-91

BACKGROUND INFORMATION:

Mr. Lundeen is a 41 year old divorced man who indicates he comes to the hospital because of "two very stressful situations that have been problematic for a long time: (1) Interpersonal relations, especially with women (2) Finding and fitting into suitable, professional employment." He was once hospitalized for psychiatric treatment at the North Hampton, Massachusetts VA in the fall of 1977. He indicates that his father, who died in 1983, was alcoholic. There is no other family history for psychiatric problems. He is the oldest of three brothers.

Mr. Lundeen was in the Marine Corps from 1968 to 1972 serving in Vietnam for 18 months where he was a radio operator. He served 18 months in Vietnam where he was exposed to combat. He does not have a service connected disability. His education includes a GED while in the service and a Bachelor of Science degree in mechanical engineering. He is currently unemployed and lists six previous jobs that lasted from two to seven months. He also indicates "some small legal problems involving alcohol sometimes, or occasionally women." He reports drinking once or twice a week but that he has never been a heavy drinker.

TEST RESULTS:

On the Shipley, a screening test of intellectual abilities, he scores in the above average range on vocabulary, in the high

(Continue on reverse) (over)

LUNDEEN, BRUCE
SS# 470 58 6±32

**SUPPLEMENT**
**DEFINED**
**DATA BASE**

Attachment #2, backside

average range on abstractions, with a full scale score in the above average range. There do not appear to be any cognitive problems and this is likely an area of strength for him.

In spite of his report of past small legal problems with drinking, on the MAST his score is below the cutoff for alcohol related problems. On the MAST he denies having been arrested because of drunken behavior, so apparently the "small problems" never led to an arrest or being taken into custody.

His response to the MMPI is somewhat unusual in that he both denies some mildly negative items which most people would admit to, but on the other hand endorses other negative items which most people might deny. This combination can suggest some unusual and disturbed thinking. The clinical scales do indicate paranoid thinking with belief that people have it in for him and mistreat him. Men with this profile tend to be seen as angry, sullen, blaming and rigidly argumentative. There is likely a history of social maladjustment with family conflicts and a poor work history. These men are generally described as controlled but may have occasional outbursts of violence to the surprise of people around them. There is a high level of social alienation, feeling that he does not belong and cannot relate in gratifying ways. He is apt to see himself as special and different from others and somewhat thin-skinned. He is apt to blame others for his negative feelings and problems. He is anxious and may find it difficult to make decisions, feel that life is a strain and obsess and worry about problems. He may at times feel overwhelmed by his own thoughts. The diagnostic impression is of a paranoid disorder.

Statements from psychological testing should be considered hypotheses requiring further validation.

Bullshit
Written by the
wife of VA
Psychologist J.R.
for her MAD
& Lt Husband
now retired

Jane Rinehart

JANE RINEHART, Ph.D.
Staff Psychologist



Attachment #3

Jemima Faiella
467-3004

Stichts remaining in my neck

Attachment #4

Printed "text" messages from Lynne Torgerson

**Conversation Information**



Lynne Torgerson
Options
Search in Conversation
Edit Nicknames
Change Color
Change Emoji
Notifications
**Messages**

1/20/15, 6:47 AM

Bruce

5/4/17, 10:44 PM



Lynne
Hi Bruce, I hope this finds you well. Say, what do you know about Jonathan Honerbrink running for mayor. Who do you know that is supporting him? Please advise. Thanks.

5/5/17, 6:53 AM

Bruce

5/5/17, 8:12 AM



Lynne

Okay, please don't mention my name.
Thank you!

9:42 AM



Lynne

Bruce, You are hereby directed to not have any further contact with me. Do not call me. Do not write me in a letter. Do not contact me via email, Facebook, Twitter, or otherwise. Do not approach me. Do not talk to me. Do not contact me directly or indirectly or through another person. All contact is unwelcome. Leave me alone. Please also note that I am aware that you suffer from schizophrenia. I recommend that you get on medication. Good bye Bruce Lundeen.



Lynne

P.S. Please also note that repeated (defined as two) unwelcome contacts is grounds for a harassment restraining order. Cease contact with me immediately. Lynne Torgerson